UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

ROMELLY DASTINOT,                  )
                                   )
            Plaintiff              )
                                   )
      v.                           )        2:18-cv-00166-JCN
                                   )
SCOTT WATKINS, TYLER HAM,          )
& MARK LEMOS,                      )
                                   )
            Defendants             )

**ORDER ON MOTION FOR JUDGMENT AS A MATTER OF LAW**

Plaintiff alleged that during an encounter with three police officers, in violation of his constitutional rights, he was stopped, arrested, and subjected to excessive force. (Complaint, ECF No. 1; Order on Objections to Recommended Decision on Motion to Dismiss, ECF No. 24; Amended Complaint, ECF No. 27.)  After a five-day trial, a jury determined that: (1) Plaintiff proved Defendant Lemos unlawfully stopped Plaintiff and that Plaintiff was entitled to nominal damages; (2) Plaintiff did not prove that Defendant Watkins unlawfully arrested him; (3) Plaintiff did not prove that Defendants Watkins and Lemos used excessive force against him; and (4) Plaintiff proved that Defendant Ham used excessive force against Plaintiff when Defendant Ham directed a canine to bite-and-hold Plaintiff and that Plaintiff was entitled to $150,000 in compensatory damages. (Jury Verdict, ECF No. 182.)

Defendant Ham has moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b).[1]  Defendant Ham argues that no reasonable jury could have determined that the bite-and-hold was objectively unreasonable under the Fourth Amendment and, alternatively, that he is entitled to qualified immunity on the claim. (Renewed Motion, ECF No. 194.)  Plaintiff opposes the motion.  (Response, ECF No. 199.)

After consideration of the evidence and the parties' arguments, the Court denies Defendant Ham's motion for judgment as a matter of law.

## RELEVANT FACTUAL BACKGROUND

### A.    The Initial Interaction

Shortly after 1:00 a.m. on February 15, 2014, Plaintiff and other individuals exited a night club at the southwest corner of the intersection of Court Street and Main Street in Auburn, Maine.  Plaintiff testified that he saw a taxi outside the club, but when he approached the vehicle, the driver informed Plaintiff that he already had a fare.  The driver told Plaintiff that he would return soon to transport Plaintiff home.  Plaintiff described the taxi as pulled over and not blocking a driving lane.  One of Plaintiff's friends testified that they got into the vehicle, they then exited the vehicle because it was not their taxi, another group of people got in the taxi, and the taxi drove away.

Defendant Lemos, who was in a police vehicle parked further down on Court Street, testified that he saw a taxi stopped in a driving lane and that multiple individuals were

---

[1] At the close of the evidence, Defendants moved pursuant to Rule 50(a) for judgment as a matter of law. (Motion, ECF No. 176.)  The Court deferred a final ruling on the motion as to Defendant Ham in part because he raised the issue of qualified immunity, which issue the Court determined would be appropriate to address in post-verdict proceedings. (Order, ECF No. 181.)

standing around the vehicle, moving in front of and behind the vehicle.  Defendant Lemos moved his vehicle to a parking space closer to the intersection, got out of his vehicle, and approached the individuals.  Defendant Lemos testified that he only intended to issue a warning for obstructing a public way and to direct the individuals to move along. Defendant Lemos claimed Plaintiff and his friend were still in the roadway until he directed them to the sidewalk to talk with them and document their identities.[2]  Plaintiff testified that they were already on the sidewalk when Defendant Lemos approached.  Defendant Lemos directed Plaintiff and one of his friends to provide identification.  Plaintiff's friend provided his photo identification without delay.  Plaintiff initially declined to provide his ID but did so eventually.

Defendant Watkins was nearby when Defendant Lemos approached Plaintiff and his friend.  As Defendant Lemos checked the individuals' identifications through dispatch, Defendant Watkins approached and began conversing with Plaintiff.  The conversation escalated to a dispute, with each party accusing the other of using offensive language.  The officers also testified that Plaintiff was very loud, which Plaintiff disputes. Defendant Watkins testified that he gave Plaintiff a verbal warning for disorderly conduct.  Plaintiff denied that he received any such warning.  According to Defendant Watkins, Plaintiff continued yelling and swore at Defendant Watkins, at which point Defendant Watkins told Plaintiff that he was under arrest and frisked him for weapons and contraband.  Defendant

---

[2] Defendant Watkins asserted that the Auburn Police Department instructs officers to attempt to identify any individual with whom they interact and to document or log the encounter.

3

Watkins maintained that he attempted to place Plaintiff under arrest for being loud and unreasonable.

## B.     The Physical Altercation

Defendant Lemos and Defendant Watkins asserted that Plaintiff began to fight with them when Defendant Watkins attempted to place him under arrest.  According to the two officers, Plaintiff punched Defendant Lemos and was swinging at Defendant Watkins. Defendant Lemos delivered what he described as a softening blow, or a slap, to Plaintiff's face and attempted to knee Plaintiff.  Plaintiff asserts that Defendant Watkins threw him against a car and held one of Plaintiff's hands behind Plaintiff's back while Plaintiff asked why he was being arrested, at which point Defendant Lemos punched him in the face and kneed him.

Defendant Lemos testified that he attempted to discharge his taser, but the darts failed to deploy.  Defendant Lemos then pulled the cartridge off the weapon and attempted to use the taser in drive-stun mode by pressing the two metal probes at the front of the device against Plaintiff's back.[3]  Plaintiff testified that the taser was very painful and caused his muscles to contract.  As Defendant Lemos applied the taser, Plaintiff and Defendant Lemos went to the ground.  Contact between the taser and Plaintiff was broken when

---

[3] Defendants and their chief of police testified that a taser can achieve neuromuscular incapacitation when the darts successfully fire into separate points on a person's body, but a taser is not intended to achieve that effect when the probes are manually pressed against a person's skin in drive-stun mode.  Instead, drive-stun mode is a pain-compliance technique.  *See also*, *Gray v. Cummings*, 917 F.3d 1, 8 (1st Cir. 2019) (noting that concept in policies and cases).

Plaintiff reacted to the taser and fell.  While on the ground, Defendant Lemos tried to reestablish contact for the remainder of the five-second firing cycle.

According to the two officers, Plaintiff was on the ground on his back, face up, while the two officers were on top of Plaintiff attempting to overcome his physical resistance and handcuff him.  The officers testified that Plaintiff was attempting to grab the taser while the three men struggled on the ground.  Plaintiff maintains that after the initial contact with the taser, he was face down on the ground.  Plaintiff asserted that he was not fighting with the officers and denied that he was attempting to grab the taser.  Plaintiff testified that he was in pain when he was on the ground because he was being tased by one officer while the other officer was forcing Plaintiff's face into the ground.

A bystander began recording video of the encounter as the two officers were on top of Plaintiff.  The person holding the camera appears to be on the sidewalk on the same side as the club, the two officers and Plaintiff are shown on the ground in the street in the lane closest to the sidewalk, and a police vehicle with its lights on is stationary behind them in the middle of the street.

The video recording shows Defendants Lemos and Watkins on top of Plaintiff.  Defendant Watkins is on Plaintiff's upper body area, and Defendant Lemos is on Plaintiff's lower body area.  Movement is visible among the three individuals, but likely due to the darkness of night and the sources of bright light nearby, the details of Plaintiff's position and most of the specific movements of the three men are not discernible.  Some audible clacking sounds can be heard at the beginning of the recording.  The evidence suggested that clacking noises occur when electricity arcs through the air between the metal probes

because the taser is energized but not in contact with a person at that moment.  One of Plaintiff's friends testified that she did not see Plaintiff resisting the officers.  The person recording the video can later be heard saying that Plaintiff was not resisting.

## C.    The Use of the Canine

Defendant Ham, who was called to the scene as a cover officer for Defendant Lemos when Defendant Lemos initially approached the individuals around the taxi, arrived at the scene later than Defendants Lemos and Watkins.  Defendant Ham parked his vehicle, and as Defendants Lemos and Watkins were on top of Plaintiff, Defendant Ham approached with his canine on a leash.

Defendant Ham testified that he told Defendants Lemos and Watkins to get off Plaintiff, and they did so quickly.  As soon as Defendants Lemos and Watkins let go of Plaintiff, Defendant Ham directed the canine to bite-and-hold Plaintiff.  The canine bit down on the upper knee area of Plaintiff's leg.  Defendant Ham testified that he then told Plaintiff to put his hands behind his back and that Plaintiff complied immediately.  As the canine continued to hold Plaintiff by the knee, Defendant Watkins knelt over Plaintiff's upper body area and placed handcuffs on his wrists.  Prior to the moment Defendant Watkins knelt over Plaintiff again, it is difficult to discern Plaintiff's position from the video recording, but at that point, the video shows that Plaintiff was face down on the ground with his arms behind his back.  Defendant Ham confirmed at trial that when the dog bit and held onto Plaintiff's leg, the dog's longest and sharpest teeth—those that protrude from the top of dog's mouth—went into the back of Plaintiff's knee.

After Defendant Watkins secured Plaintiff's arms, Defendant Ham commanded the canine to release and he pulled the canine away from Plaintiff. The video recording shows that, in total, the canine bit Plaintiff for approximately twenty-four seconds. Defendant Watkins continued to kneel around and over Plaintiff's upper body area. Defendant Lemos knelt near Plaintiff's lower body area, bent one of Plaintiff's legs upward toward his back, and assisted Defendant Watkins in holding Plaintiff on the ground. Defendant Watkins testified that Plaintiff was still "tensed up" and "agitated," so he reiterated to Plaintiff to relax and stop resisting. Plaintiff can be faintly heard on the recording to say that he was not resisting.

An ambulance subsequently arrived. Plaintiff was taken to the hospital and treated for the bite wounds on his leg. Plaintiff has visible scars on the back of his leg in the knee area. Plaintiff testified that he continues to experience pain from the wounds.

## LEGAL STANDARD

"[B]efore a case is submitted to the jury," Rule 50(a) authorizes parties to move the court to resolve issues or grant judgment as a matter of law "if a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). Within twenty-eight days following the verdict and entry of judgment, a party "may file a renewed motion for judgment as a matter of law" or a motion for a new trial. Fed. R. Civ. P. 50(b), 59. Arguments and legal theories not raised prior to a jury verdict in a Rule 50(a) motion are deemed waived and therefore cannot support a post-verdict Rule 50(b) motion. *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1196 (1st Cir. 1995).

"A trial court evaluating a motion for judgment as a matter of law under Rule 50(b) must view the evidence in the light most flattering to the verdict and must draw all reasonable inferences therefrom in favor of the verdict." *Rodriguez-Valentin v. Doctors' Ctr. Hosp. (Manati), Inc.*, 27 F.4th 14, 20 (1st Cir. 2022) (internal quotation marks omitted).  Courts are not permitted to evaluate the credibility of witnesses or weigh the evidence for and against a factual question.  *Parker v. Gerrish*, 547 F.3d 1, 8 (1st Cir. 2008).  "A party seeking to overturn a jury verdict faces an uphill battle," because a court ultimately may only overturn "a jury's determination when the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party."  *Jones ex rel. U.S. v. Massachusetts Gen. Hosp.*, 780 F.3d 479, 487 (1st Cir. 2015) (internal quotation marks omitted).

## DISCUSSION

### A.    Excessive Force

Excessive force claims are evaluated under the Fourth Amendment's "objective reasonableness" standard.  *Graham v. Connor*, 490 U.S. 386, 388 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  *Id.* at 396 (some internal quotation marks omitted) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).  In the context of force applied to make an arrest, the relevant factors for consideration include "the severity of the crime at issue,

8

whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. A court's assessment must also account for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396 – 97. The test is not a subjective inquiry: courts ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

Defendant Ham was dispatched as a cover officer for Defendant Lemos when Defendant Lemos approached Plaintiff intending to issue a warning for obstructing a public way, which warning or order to move along is a necessary precondition for the commission of that offense. 17-A M.R.S. § 505. Obstructing a public way is a class E crime, *id.*, which means it is punishable by a maximum of six months in jail, 17-A M.R.S. § 1604(1). When Defendant Ham was dispatched, no violation had yet occurred. Even if Plaintiff refused to move along after Defendant Lemos ordered him to do so, the offense would be considered a misdemeanor and relatively minor for purposes of the excessive force analysis.

The trial testimony, however, showed that obstructing a public way was not the crime of arrest. Defendant Watkins first attempted to place Plaintiff under arrest for disorderly conduct based on Plaintiff's response to his interactions with Defendant Lemos

and Watkins.  Disorderly conduct is also a class E crime, 17-A M.R.S. § 501-A(3), a misdemeanor punishable by a maximum of six months in prison.  For purposes of analyzing this *Graham* factor, therefore, the crime of arrest was not particularly serious.  *See Morelli v. Webster*, 552 F.3d 12, 23 (1st Cir. 2009) (finding first factor weighted against reasonableness of officer's use of force because "[i]f a crime was committed at all, it was a Class E crime (the lowest level of criminality recognized under Maine law)").  Because both offenses that arguably led to Plaintiff's arrest are relatively minor for purposes of the use of force, the first factor weighs in favor of Plaintiff's excessive force claim.[4]

The record lacks any evidence that the officers suspected Plaintiff had threatened any bystanders or would likely do so, or that he possessed a weapon.  In fact, because Defendant Ham directed the two other officers to get off and release Plaintiff—freeing Plaintiff's hands and arms in the process—any contention that Defendant Ham had an objectively reasonable basis to believe Plaintiff might have had a firearm or other weapon would be questionable.  The central issue for the second *Graham* factor (i.e., whether Plaintiff posed an immediate threat to the safety of the officers or others), therefore, is

---

[4] Defendant Ham testified that his actions were not based on the crimes of obstructing a public way or disorderly conduct but were instead based on what he perceived as a person fighting with police officers. Although resisting arrest and assaulting a police officer can constitute crimes, they were not the bases of the decision to place Plaintiff under arrest and take him into custody. The extent of the resistance to being arrested, if any, is properly analyzed under the second and third *Graham* factors.  Defendant Ham's argument is perhaps best viewed as relevant to weight of the first factor, and the Court considers it for that purpose.

whether Plaintiff attempted to take possession of Defendant Lemos's taser, as Defendants asserted.[5]

Plaintiff's alleged attempt to grab the taser was disputed at trial.  Defendants testified that Plaintiff was fighting and attempting to grab the taser away from Defendant Lemos, presumably to use against the officers.  Plaintiff denied attempting to grab the taser. The physical position or orientation of Plaintiff is relevant to the assessment of the issue. If Plaintiff was on his back, he would have been in a better position to resist the officers and to grab the taser.  If Plaintiff was on his stomach with the two officers on top of him, Plaintiff arguably would have been less likely to attempt to or to be in position to take possession of the taser.   A careful examination of the video evidence does not definitively resolve the issue.  Accordingly, the video evidence is subject to the jury's interpretation and assessment.

Construing the evidence in the light most favorable to the verdict, as the Court must, the jury could have reasonably determined that Plaintiff was not attempting to grab the taser.  That is, a reasonable jury could find Plaintiff's testimony more credible than Defendants' testimony regarding Plaintiff's position on the ground and his actions regarding the taser.  The jury could also have determined that Plaintiff's account was more consistent with subsequent portions of the video recording showing Plaintiff face down on

---

[5] The Court analyzes the closely related and disputed issue of the extent of Plaintiff's physical resistance under the third *Graham* factor.

the pavement and other circumstantial evidence, such as the location of the bite marks on the back of Plaintiff's knee.

Because the jury reasonably could have determined that Plaintiff was unarmed, not attempting to grab the taser, and was face down on the ground with two officers on top of him, the jury could have reasonably determined that Plaintiff did not pose a significant or urgent threat to the officers or others when Defendant Ham directed the officers to release him and then directed the canine to bite-and-hold Plaintiff.  The second *Graham* factor, therefore, weighs in Plaintiff's favor.

The next relevant issue in assessing the sufficiency of the evidence to support the jury's excessive force finding is Plaintiff's alleged resistance.  A logical conclusion from the jury verdict in favor of Defendants Lemos and Watkins on the excessive force claim is that the jury did not find credible Plaintiff's testimony that before Plaintiff went to the ground, Defendants Lemos and Watkins struck and tased Plaintiff without any resistance by Plaintiff.  Because the alleged physical contact and use of the taser would likely not have been justified against a person who did not resist, *see Parker v. Gerrish*, 547 F.3d 1, 9 (1st Cir. 2008) (finding use of a taser excessive when the plaintiff was defiant but offered only de minimis resistance), the jury's verdict can reasonably be construed to reflect the jury's finding that at least initially, Plaintiff physically resisted the arrest.  The fact that Plaintiff might have initially resisted, however, is not dispositive.  The inquiry continues because an officer can violate the Fourth Amendment through "the increased use of force on a previously resisting but now non-resisting arrestee," *Jennings v. Jones*, 499 F.3d 2, 18 (1st Cir. 2007) *see also*, *Pearson v. Taylor*, 665 F. App'x 858, 864 (11th Cir. 2016) ("when

the [subject] is no longer resisting" a previously reasonable use of force "can constitute excessive force"); or by using too great a level of force against a person who was resisting but who did not represent a serious threat. *See Gray v. Cummings*, 917 F.3d 1, 9 (1st Cir. 2019) (concluding there was a viable Fourth Amendment claim when a significantly larger officer tased a mentally ill subject who was resisting but had been sufficiently subdued so as not to pose a serious threat).

On this record, the jury could have supportably determined that after he went to the ground, Plaintiff was face down with two officers on top of him and another officer nearby, while being tased in the mode designed to cause considerable pain.[6]  Several witnesses testified to the pain generated from the use of a taser in drive-stun mode and acknowledged that subjects will involuntarily move in response to the taser and flinch away from the painful stimulus. *See also*, *Glasscox v. City of Argo*, 903 F.3d 1207, 1215 (11th Cir. 2018) (distinguishing between "an involuntary response to a painful stimulus" and an attempt to grab the taser in "an act of resistance").  The jury could have reasonably concluded, therefore, that any movement by Plaintiff depicted in the video recording reflected Plaintiff's natural movement after being tased.

Other portions of the video recording also support an inference that Plaintiff was not fighting or significantly resisting as Defendant Ham approached the scene.  Some movement under the officers was visible while the taser was energized, but just after

---

[6] The clacking sounds imply that the taser was not in contact with Plaintiff's body the entire time, but there is at least one noticeable moment when the sounds ceased and then continued, which a reasonable jury could have viewed as confirmation of Plaintiff's testimony that he experienced significant pain from the taser while he was on the ground.

Defendant Ham directed the two officers to get off Plaintiff, there was a brief time where Plaintiff was on the ground unrestrained before the canine bit Plaintiff's knee. Plaintiff did not attempt to get up or fight, even though he presumably could or would have done so if he had been physically resisting or intended to resist physically. A reasonable jury could have concluded that although he had resisted before going to the ground, Plaintiff remained on the ground because his most recent movement was the result of his tensing or flinching in response to the pain from the use of the taser, which pain had ceased when Defendants Lemos and Watkins released him. All the *Graham* factors, therefore, support Plaintiff's excessive force claim when the facts are viewed most favorably to the verdict.

Finally, because dog bites can be painful, frequently leave wounds on the subject's body, and can cause lasting damage, *see e.g.*, *Hood v. Koeller*, No. 1:05CV1484-RLY-WTL, 2007 WL 1468712, at *4 (S.D. Ind. May 18, 2007) ("any officer who releases a trained police dog to subdue a suspect knows that he is directing the use of force that is much more likely to inflict serious injury than other methods"); *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 362 (4th Cir. 2010) (Michael, J, concurring in part and dissenting in part) ("As many cases document, find-and-bite police dogs have caused serious injury, disfigurement, and even death"), whether the police officer gave a warning before directing the dog to bite is also a consideration in a court's assessment of an excessive force claim. *See Jarrett v. Town of Yarmouth*, 331 F.3d 140, 143, 147–49 (1st Cir. 2003) (repeatedly emphasizing that the police officer had given the proper verbal warnings that if the plaintiff did not comply, the officer would deploy the dog); *Kuha v. City of Minnetonka*, 365 F.3d 590, 599 (8th Cir. 2003) ("the presence or absence of a warning is a critical fact in virtually

14

every excessive force case involving a police dog");[7] *Glenn v. Washington Cnty.*, 673 F.3d 864, 872 (9th Cir. 2011) ("Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed").

Here, Defendant Ham did not provide any warning before directing the canine to bite-and-hold Plaintiff.  Defendant Ham did not allow Plaintiff an opportunity to comply or to signal his compliance before Defendant Ham directed the dog to bite.  The jury could have reasonably interpreted Plaintiff's immediate compliance with Defendant Ham's order to put his hands behind his back as evidence of his intent to comply before Defendant Ham directed the dog to bite-and-hold.

In sum, the jury could have reasonably concluded that when Defendant Ham arrived at the scene (1) no crime had been committed, (2) there was no basis to suspect that Plaintiff was armed or dangerous, (3) although Defendant Ham could reasonably conclude that Plaintiff initially offered some resistance to the efforts of Defendants Watkins and Lemos to arrest him, after he went to the ground, Plaintiff was face down and not in a position to grab the taser, (4) there were two officers on Plaintiff, (5) Defendant Ham could see and hear that Defendant Lemos was using his taser on Plaintiff in drive stun mode, and (6)

---

[7] Some courts describe *Kuha* as abrogated in part on other grounds by *Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385 (8th Cir. 2007).  The *Szabla* Court differed with the *Kuha* Court on the standard for municipal liability based on policies regarding police canines, an issue that is not relevant here. *Id.* at 392.  The *Szabla* Court "accepted the Fourth Amendment holding" from *Kuha* regarding the need for a warning before the officer deployed the police dog.  *Id.* at 392.

because Defendant Ham had time to direct the other officers to release Plaintiff and get out of the way, which left Plaintiff alone on the ground surrounded by officers, Defendant Ham could have warned Plaintiff before directing the dog to bite-and-hold, which predictably resulted in a serious injury.  Accordingly, the Court concludes that the jury supportably determined that there was a constitutional violation because—drawing all reasonable inferences in favor of the verdict—the relevant factors weigh against Defendant Ham and in favor of Plaintiff's excessive force claim.[8]

## B.    Qualified Immunity

Qualified immunity protects public officials from suit for violations of constitutional rights except when officials were "plainly incompetent" or "knowingly violate[d] the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  The qualified immunity doctrine is designed to balance "two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from

---

[8] Defendant Ham argues that Plaintiff's movements shown in the video recording are sufficient to establish that a reasonable officer in his position could have "reasonably, but mistakenly, believed that a suspect" was "fight[ing] back," which might have made him "justified in using more force than in fact was needed." *Saucier v. Katz*, 533 U.S. 194, 205 (2001).  Whether Plaintiff's actions were reasonably susceptible to a mistaken interpretation is arguably more appropriately addressed in the assessment of Defendant's qualified immunity argument.  *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (discussing mistakes of fact in the context of qualified immunity).  In assessing Plaintiff's challenge to the jury's excessive force finding, the Court must view the evidence most favorably to the verdict.  As explained above, the evidence would support a jury's determination that Plaintiff was not resisting at the time Defendant deployed the canine.  Even if the potential for misinterpretation of the circumstances is an appropriate consideration in the analysis of the *Graham* factors in this case, and even if the Court determined that the potential for misinterpretation existed, the result would be the same.  The jury's verdict is still supportable because the jury could have reasonably determined that any misinterpretation of Plaintiff's actions as depicted on the video recording was insufficient to justify the escalation to a canine bite-and-hold on a person who was not yet handcuffed but was sufficiently subdued so as not to constitute a serious threat, *see Gray*, 917 F.3d at 9, especially without any warning or opportunity to comply. *See Jarrett*, 331 F.3d at 143, 147–49; *Kuha*, 365 F.3d at 599.  Furthermore, the record lacks any evidence that Plaintiff attempted to flee at any time. The use of the canine bite-and-hold in this case, therefore, cannot be justified based on a need to locate and prevent a person from fleeing.

harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).   An official's reasonable mistake is protected regardless of whether it is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (internal quotation marks omitted).

When considering the question of qualified immunity after a jury verdict, a court views the facts most favorably to the verdict. *Raiche v. Pietroski*, 623 F.3d 30, 35 (1st Cir. 2010).   "The qualified immunity analysis has two facets:  the court must determine whether the defendant violated the plaintiff's constitutional rights and then must determine whether the allegedly abridged right was clearly established at the time of the defendant's claimed misconduct." *Gray v. Cummings*, 917 F.3d 1, 10 (1st Cir. 2019) (internal quotation marks and citations omitted).   On the second issue (i.e., the "clearly established" issue), to avoid the application of qualified immunity, a plaintiff must: (1) "identify either controlling authority or a consensus of cases of persuasive authority sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm," and (2) "demonstrate that an objectively reasonable official in the defendant's position would have known that his conduct violated that rule of law." *Id.* (internal quotation marks and citations omitted).

The relevant rule of law "must be particularized to the facts of the case" rather than "defined at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 552 (2017); *see also*, *Hunt v. Massi*, 773 F.3d 361, 368 (1st Cir. 2014) ("the relevant question" for purposes of clearly established law "is not whether the Fourth Amendment generally prohibited excessive force").   "This does not mean that an official action is protected by qualified

immunity unless the very action in question has previously been held unlawful, but rather that in the light of pre-existing law the unlawfulness must be apparent." *Barton v. Clancy*, 632 F.3d 9, 21–22 (1st Cir. 2011) (internal quotation marks omitted); *see also*, *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011) (no single prior case needs to be "directly on point" as long as the rule was beyond debate).  "The salient question is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (internal quotation marks and modifications omitted).

Prior to February 2014, a consensus of authority established that it is unlawful for an officer to direct a canine to bite-and-hold a suspect without warning or opportunity to comply when it was feasible to provide one, including when there is no urgency or substantial threat, such as when a suspect is unarmed, on the ground, and surrounded by multiple officers.  *See Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 789 (6th Cir. 2012) (officer was not entitled to qualified immunity when he "failed to give warnings" during two incidents before allowing a canine to bite unarmed suspects when "the suspects were not believed to be a threat to anyone at the time the canine unit was called in," had "no ability to evade police custody" due to proximity to officers, and were "in areas unlikely to expose police to ambush"); *Chatman v. City of Johnstown, PA.*, 131 F. App'x 18, 20 (3d Cir. 2005) (when police used a dog to apprehend plaintiff, who was wanted on an outstanding warrant and spotted walking on a city street, the issue of "[w]hether plaintiff received a warning before the dog was released or not until afterwards is a material question of fact" precluding summary judgment); *Kuha v. City of Minnetonka*, 365 F.3d 590, 598

(8th Cir. 2003) (acknowledging that "there may be exceptional cases where a warning is not feasible," but holding in the context of a suspect who fled from a routine traffic stop and hid, "the allegation that the police officers failed to give a verbal warning prior to using a police dog trained to bite and hold is sufficient to state a Fourth Amendment claim"); *Bey v. Cimarossa*, 202 F.3d 272, 2000 WL 12830 at *2 (7th Cir. 2000) (denying summary judgment to an officer based on plaintiff's testimony that he was not fleeing and the officer "failed to issue a warning" and "never gave him an opportunity to peacefully surrender before ordering the dog to attack"); *Vathekan v. Prince George's Cnty*, 154 F.3d 173, 175 (4th Cir. 1998) (officer investigating possible break-in who directed dog to search a house and bite was not entitled to qualified immunity because "it was clearly established in 1995 that it is objectively unreasonable for a police officer to fail to give a verbal warning before releasing a police dog to seize someone"); *Burrows v. City of Tulsa, Okl.*, 25 F.3d 1055 1994 WL 232169 at *4 (10th Cir. 1994) (in the context of an attempt to arrest a plaintiff on outstanding warrants for forgery, false impersonation, and check fraud, jury could have found the "failure to warn" plaintiff before putting a dog over the fence to find and bite the plaintiff to be objectively unreasonable).

Police officers, however, are permitted to deploy canines to bite-and-hold subjects without providing a warning or opportunity to comply when it is not feasible to do so, including when the circumstances present greater urgency or when revealing the officer's location by calling out would put the officer's safety at risk. *See Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1321 (10th Cir. 2009) (no liability for sending dog without a warning when police were searching for suspect who had threatened others with a gun because "[a]

19

warning is not invariably required even before the use of deadly force, let alone here, where the release of the dog was nondeadly force used in the face of an imminent threat"); *Johnson v. Scott*, 576 F.3d 658, 660–61 (7th Cir. 2009) (no liability for sending dog to bite plaintiff without a warning when officers were responding to a suspected shooting and plaintiff fled first in a vehicle and then on foot); *Grimes v. Yoos*, 298 F. App'x 916, 923 (11th Cir. 2008) (no liability for sending without a warning a dog to find and bite when it would increase the likelihood that suspect would escape and "the defendants had reason to believe that [plaintiff] may pose a risk to their safety" following a burglary because the officers believed suspect may be armed and they were in a location with thick vegetation and low visibility); *Est. of Rodgers ex rel. Rodgers v. Smith*, 188 F. App'x 175, 182 (4th Cir. 2006) (no liability for sending a dog to bite without a warning when another officer yelled "Gun!" and noting that prior Fourth Circuit cases "stand at most for the principle that the Fourth Amendment is violated when an officer *who faces no immediate threat* deploys a police dog without prior warning") (emphasis in original); *see also*, *McKinney v. City of Middletown*, 49 F.4th 730, 741 (2d Cir. 2022) (in the context of a prisoner who admittedly grabbed police baton, charged officers, and continued fighting with officers even after dog's bite-and-hold, no liability because "deploying a police dog may be objectively reasonable, even without a warning, when there is an immediate threat to the safety of officers and the community") (internal quotation marks omitted).

Officers trained as canine handlers in Maine, such as Defendant Ham, are instructed consistent with these principles.[9]  Indeed, given that research revealed that in most cases in which canines have been directed to bite, a warning has been given, it is reasonable to conclude that most police canine handlers around the country are regularly trained using those principles.  *See e.g.*, *Jones v. Fransen*, 857 F.3d 843, 848 (11th Cir. 2017) (noting that officers "issued what are known as K–9 warnings"); *Grimes v. Yoos*, 298 F. App'x 916, 919 (11th Cir. 2008) (noting that according to training manual, "[b]efore using such force, the police officers generally were required to give a verbal warning to allow the suspect to surrender.  However, when such a warning would 'prove unsafe to the search team or allow the offender to escape,' the police dog handler conducting the search could decide not to provide the warning"); *Chew v. Gates*, 27 F.3d 1432, 1471 (9th Cir. 1994) (Trott, J. concurring in part and dissenting in part) (noting that suspects are given a specific warning before Los Angeles Police Department K–9 Unit police dogs are used, which gives the suspect control over his own fate).

Under the facts of this case, it would have been clear in 2014 to an objectively reasonable officer in Defendant Ham's position that his or her conduct violated the rule of law that required a warning before a canine was deployed.  The facts, when viewed most favorably to the verdict, include: (1) when Defendant Ham was dispatched, no crime had

---

[9] When asked if it is good police practice to first tell someone they better stop or he would send the dog in for a bite, Defendant Ham responded that would be proper "if time allows it in certain circumstances."  Defendant Ham also confirmed that the goal in using K-9s is to gain voluntary compliance "in certain situations when practical" by telling an individual to comply or the dog would be used.  Defendant Ham also admitted that he did not give Plaintiff the opportunity to comply on February 15, 2014.

been committed, (2) throughout the encounter, there was no basis to suspect that Plaintiff was armed, (3) although Defendant Ham was entitled to conclude that Plaintiff initially offered some resistance to Defendants Watkins's and Lemos's efforts to arrest him, after going to the ground, Plaintiff was face down and not in a position to grab the taser, (4) there were two officers on Plaintiff when Defendant Ham first observed Plaintiff, (5) there has never been an assertion that Plaintiff or the location presented a reasonable fear of ambush or a need to conceal Defendant Ham's location which would have been compromised by calling out a warning, and (6) Defendant Ham had time to direct the other officers to release Plaintiff and get out of the way before deploying the canine to bite Plaintiff.  A reasonable officer in Defendant Ham's position could not have perceived the kind of urgency or threat to the officers or the public which courts have recognized as sufficient to justify the use of a canine bite-and-hold without any warning or opportunity for the subject to comply voluntarily.

Defendant Ham nevertheless offers three arguments to challenge the suggestion that his failure to warn can support the verdict, which arguments focus in part on the state of the law in 2014.  First, he argues that a warning is only required in deadly force situations and courts have held that police canines do not necessarily constitute deadly force.  *See e.g.*, *Becker v. Elfreich*, 821 F.3d 920, 926 (7th Cir. 2016) (describing dog bite as force "at the higher end of the spectrum" yet concluding that dogs are not per se deadly force, but

rather depends on how a dog is trained).[10] The Supreme Court has held that deadly force can only be justified by an urgent threat and that a warning is required when feasible before using deadly force. *See Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985); *McKenney v. Mangino*, 873 F.3d 75, 82 (1st Cir. 2017). The cited authority, however, does not imply that the use of deadly force is the only scenario where a warning is required. As discussed above, because of the significant injury dog bites ordinarily inflict, the law was clearly established that when feasible (e.g., when no immediate threat of harm exists) a warning is required before an officer can lawfully direct a canine to bite-and-hold. Lower courts have also held that warnings are sometimes required in other circumstances. *See*, *e.g.*, *Mattos v. Agarano*, 661 F.3d 433, 451 (9th Cir. 2011) (concluding that the lack of a warning before firing a taser made the force unreasonable because "[w]e have previously concluded that an officer's failure to warn, when it is plausible to do so, weighs in favor of finding a constitutional violation"); *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007) (in the context of a misdemeanant who was struggling with another officer but was not violent or fleeing, noting that "[t]he absence of any warning—or of facts making clear that no warning was necessary—makes the circumstances of this case especially troubling").

Defendant Ham next argues that the cases in which a bite-and-hold warning was required are factually distinguishable from the circumstances of this case. For example,

---

[10] In *Jarrett*, 331 F.3d at 149, the First Circuit also raised a question as to whether the use of a canine constitutes deadly force per se, but it did not explicitly resolve the issue.

some cases involved scenarios where a dog was released from a leash, whereas Defendant Ham kept the canine on a leash.  The deliberate release from a leash has been cited in some cases, such as when a dog bites contrary to the direction of the officer, but it is not constitutionally relevant here—Defendant Ham admitted he directed the canine to bite without warning or an opportunity for Plaintiff to comply.[11]  Minor or immaterial factual differences in the above cited cases were not sufficient to create any reasonable uncertainty about the need for a warning in the circumstances here.  *See Hope v. Pelzer*, 536 U.S. 730, 742 (2002) (teaching against "the danger of a rigid, overreliance on factual similarity"); *Hall v. Ochs*, 817 F.2d 920, 925 (1st Cir. 1987) ("The fact that no court had put these pieces together in the precise manner we do today does not absolve defendants of liability").

Finally, Defendant Ham argues even if a warning is required in certain circumstances, a warning was not feasible because Plaintiff was violently fighting with two officers and Plaintiff presented an urgent and serious threat to the officers because he was

---

[11] The Fourth Circuit's decision in *Vathekan*, 154 F.3d at 175–76, used seemingly comprehensive language in adopting a warning requirement, but the facts of that case involved the intentional release of a canine off-leash to find and bite.  The Fourth Circuit later distinguished *Vathekan* in two cases involving dogs that were tracking individuals on leashes and bit without a command from the officers because the officers mistakenly but reasonably believed the dog was under control and would not bite so abruptly.  *Melgar ex rel. Melgar v. Greene,* 593 F.3d 348, 352–53, 358 (4th Cir. 2010); *Maney v. Garrison*, 681 F. App'x 210, 214, 216–17 (4th Cir. 2017).  Likewise, the incidents at issue in the Sixth Circuit's decision in *Campbell*, 700 F.3d at 785–86, 789, depended not only on the lack of warning, but also on the lack of training of the dog, which bit at least one of the individuals while tracking on a long leash and without a command to do so. The training was presumably particularly relevant in that case because the officer could not reasonably believe that the dog would always remain under the officer's control and behave only as the officer directed. *Id.* at 783 ("Without such training, the dog's level of obedience may erode over time and the dog may not respond as well to the handler's commands").  Those cases and the distinguishable facts in this case provide no support to an officer who intentionally and without warning directs a dog to bite a person.  Because the salient variable is the likelihood that someone will be bitten and thus suffer significant injury, in a case where an officer intentionally commands a dog to bite, the presence or absence of a leash and the self-discipline of the dog in the absence of a command are not particularly relevant variables to the central legal question: whether it was feasible for the officer to provide a warning or opportunity to comply.

attempting to take the taser.  The Court, however, must construe the facts and draw all reasonable inferences in favor of the verdict.  As discussed above, the jury reasonably could have concluded that Plaintiff was not violently fighting or attempting to grab or in a position to grab the taser, especially after the officers stepped away from Plaintiff at Defendant Ham's directive.  *See Mlodzinski v. Lewis*, 648 F.3d 24, 38 (1st Cir. 2011) (no qualified immunity because "Defendants have not even come forward with a justification for [their alleged conduct].  Their defense is that they did not use the force they are alleged to have used").  Even if the Court concluded that a competent officer could have reasonably misinterpreted Plaintiff's movement when the officers were on top of him as some type of resistance,[12] the resistance was not such that it placed the officers in immediate danger.  Moreover, the movement that was arguably susceptible to misinterpretation stopped when the officers got up and moved away from Plaintiff, which was before Defendant Ham directed the canine to bite.  Any urgency that Defendant Ham might have reasonably mistakenly perceived had dissipated at the time he directed the canine to bite.

In sum, viewing the facts most favorably to the jury's verdict, the record supports a finding that a reasonable officer in Defendant Ham's situation would not have directed the canine to bite-and-hold.  In addition, the law was clearly established in 2014 that a reasonable officer could not deploy a canine to bite-and-hold when a subject was not

---

[12] It was clearly established prior to February 2014 that it is unlawful to use significant force or to increase the level of force after a person has been apprehended and has ceased resisting.  *See Jennings*, 499 F.3d at 16–18; *Parker*, 547 F.3d at 9; *see also*, *Becker v. Elfreich*, 821 F.3d 920, 929 (7th Cir. 2016) (canine handler was not entitled to qualified immunity in March 2011 for dog bite because "officers cannot use significant force on a nonresisting or passively resisting suspect").

resisting or without warning and opportunity to comply when it was feasible to provide one, such as when the subject is unarmed, on the ground, and in the presence of multiple officers (i.e., where there is no urgency or substantial threat).  Finally, an objectively reasonable officer in Defendant Ham's position would have known that his or her conduct violated that rule of law.  Defendant Ham, therefore, is not entitled to qualified immunity.

## CONCLUSION

Based on the foregoing analysis, the Court denies Defendant Ham's motion for judgment as a matter of law.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 6th day of January, 2023.